IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § § | |
| *Plaintiff,* | § § | SA-22-CR-00463-OLG |
| vs. | § § § | |
| (1) THOMAS JORGE FINCH, | § § | |
| *Defendant.* | § § § | |

**REPORT AND RECOMMENDATION
OF UNITED STATES MAGISTRATE JUDGE**

**To the Honorable United States District Judge Orlando L. Garcia:**

This Report and Recommendation concerns Defendant's Motion to Suppress Fruits of Illegal Traffic Stop [#35], which was referred to the undersigned for disposition. The undersigned therefore has authority to enter this recommendation pursuant to 28 U.S.C. § 636(b)(1)(B). Defendant's motion to suppress seeks suppression of both evidence and statements obtained as a result of a traffic stop of Defendant's vehicle. The Court held a hearing on Defendant's motion on December 19, 2023, at which all parties appeared through counsel. At the hearing, the Court heard the testimony of the officer involved in the traffic stop at issue, and the parties introduced several police reports and video footage from officer dash and body-worn cameras. At the conclusion of the hearing, the undersigned ordered supplemental briefing, and both the Government and Defendant filed additional briefs on the issues raised at the hearing [#49, #50]. The undersigned has also reviewed and considered these filings, as well as the Government's written response to the motion [#42]. After considering the evidence produced at

1

the hearing, the arguments of counsel, the parties' written briefing, and the governing law, it is recommended that Defendant's motion be denied.

## I.  Background and Evidentiary Record

Defendant Thomas Jorge Finch was indicted on September 7, 2022, for engaging in the conspiracy to transport illegal aliens and for the transportation of illegal aliens, in violation of 8 U.S.C. § 1324(a)(1)(A)(v)(I)/(B)(i) and § 1324(a)(1)(A)(ii)/(B)(i).  (Indictment [#13].)  The indictment arises out of a traffic stop conducted at close to midnight on August 17 and 18, 2022, in San Antonio, Texas.

According to the police report describing the stop, Officer Albert Sanchez with the San Antonio Police Department conducted the traffic stop of Finch's vehicle after he observed the vehicle make several lane changes without using a left or right turn signal.  Specifically, the report states that Officer Sanchez observed Finch's black Lincoln Navigator moving from the middle lane of traffic to the left lane without the use of a turn signal.  Thereafter, Officer Sanchez claims to have observed the vehicle approach an area with construction in the left and middle lanes.  As the vehicle approached the construction, Officer Sanchez states he observed the vehicle change lanes again from the left lane to the middle lane and then the right lane without the use of a turn signal.  Based on these observed traffic violations, Officer Sanchez activated his emergency lights and conducted the traffic stop.

The police report further states that, when Officer Sanchez approached the vehicle, he observed multiple bodies in the rear passenger area, laying down and covered by a "white bed type sheet."  Officer Sanchez states he also observed several cell phones in plastic bags in the front passenger seat and stated that Finch appeared nervous during the stop.  In addition to seeing the cell phones on the front seat, Officer Sanchez observed passports and South American

identification cards, as well as water bottles in the vehicle.  According to the police report, based on Officer Sanchez's training and experience, he believed Finch to be involved in human smuggling.

Officer Sanchez's hearing testimony reiterated the same—that he observed Finch fail to signal multiple lane changes, performed the traffic stop based on these moving violations, saw multiple bodies in plain view when he approached the vehicle, and believed Finch to be involved in human smuggling.  The video evidence also corroborates the majority of Officer Sanchez's account of the traffic stop itself.  Officer Sanchez approached the vehicle and asked for Finch's identification.  During the stop, several individuals, covered with a white sheet, are plainly visible through the driver-side rear window.

The parties disagree how to interpret the video evidence recording Finch's vehicle prior to the traffic stop.  Finch believes the dash cam recording clearly contradicts Officer Sanchez's statements in the police report and his hearing testimony, claiming it depicts Finch signaling the first lane change.  The Government argues the recording is not clear at all; the video quality is poor, and it is difficult to tell whether Finch activated his turn signal or if there was just a shift in lighting across the back of his car due to the bumps in the road and the movement of the vehicle.  As to the second lane change, however, the parties agree that the video footage clearly establishes that Finch did not signal his movement across two lanes in the construction area.  Finch argues, however, that he was not required by law to signal the lane change because the left and middle lanes ended due to construction and required all vehicles to merge into the right lane.

The video footage also establishes that Finch was removed from the vehicle and handcuffed as soon as Officer Sanchez noticed the individuals in the back of the vehicle.  Officer Sanchez asked Finch several initial questions about the persons observed, such as "What are they

doing lying down there like that?" and "Whose car is this?" before and during Finch's removal from the vehicle and prior to reading him any *Miranda* warnings.  Two other officers then assisted Officer Sanchez in getting eight individuals out of the vehicle.

Officer Sanchez states in the police report that he thereafter read Finch his *Miranda* warnings and obtained incriminating statements regarding the alleged conspiracy to transport illegal aliens.  The body camera footage captures the interaction between Finch and Officer Sanchez while Finch sat on the curb in handcuffs.  The video demonstrates that Officer Sanchez read Finch several warnings and obtained an affirmative statement from Finch that he understood the warnings before proceeding with further interrogation.  However, Finch argues the warnings were garbled and not understandable.

According to the probable cause affidavit submitted with the arrest warrant, Officer Sanchez thereafter notified Special Agent Rigoberto Garza from Homeland Security Investigations of the stop, and Agent Garza responded to the scene and conducted an immigration inspection of all passengers, which revealed that all eight individuals were illegally present in the United States.

Finch moves to suppress all evidence obtained as a result of the traffic stop, arguing that there was no legal basis for the stop because the evidence establishes that he signaled the first lane change and he was not required by law to signal the second lane change.  Finch also moves to suppress all statements obtained from him during the stop, arguing that he was subjected to unwarned custodial interrogation at the beginning of the traffic stop and the interrogating officers failed to provide him adequate *Miranda* warnings.

## II.  Analysis

The motion to suppress should be denied.  As to the motion to suppress evidence based on the legality of the traffic stop, the Court should deny the motion because Officer Sanchez had reasonable suspicion of a traffic violation and therefore conducted a lawful traffic stop.  As to the motion to suppress statements, the Court should deny the motion as to Finch's statements made prior to receiving *Miranda* warnings because Finch was not in custody for *Miranda* purposes during the brief exchange prior to being given the constitutionally required warnings.  Additionally, the Court should deny the motion as to Finch's statements made after receiving *Miranda* warnings because the warnings provided by Officer Sanchez were adequate and Finch voluntarily waived his *Miranda* rights before making further incriminating statements.

### A.      Officer Sanchez had reasonable suspicion for the traffic stop.

Finch contends that the traffic stop of his vehicle was unconstitutional and requires suppression of the evidence of the illegal aliens found in his vehicle.  The Government responds that the evidence before the Court establishes that Officer Sanchez had reasonable suspicion for the traffic stop based on Finch's failure to signal his change of lanes.  The undersigned agrees with the Government.

Evidence derived from an unreasonable search or seizure conducted in violation of the Fourth Amendment generally must be suppressed under the fruit-of-the-poisonous-tree doctrine. *See United States v. Cotton*, 722 F.3d 271, 278 (5th Cir. 2013).  A warrantless search or seizure is presumptively unreasonable, "subject to certain narrow exceptions."  *United States v. Alvarez*, 40 F.4th 339, 345 (5th Cir. 2022).  One exception—announced in *Terry v. Ohio*, 392 U.S. 1 (1968)—allows officers to conduct a brief investigatory stop of an individual if they have reasonable suspicion to believe the person is engaged in criminal activity.  *See United States v.*

*Alvarado-Zarza*, 782 F.3d 246, 249 (5th Cir. 2015).  This standard applies to seizures based on alleged observations of traffic violations.  *See id.*  During such traffic stops, officers are permitted to detain individuals temporarily for instance, to "verify a violation of the traffic law has occurred or is occurring; and . . . to issue the appropriate ticket or citation charging the traffic violation or make an arrest of the driver based upon the violation."  *United States v. Magana*, 544 F. Supp. 2d 560, 565 (W.D. Tex. 2008).  The government bears the burden to justify a warrantless search or seizure.  *See United States v. Monsivais*, 848 F.3d 353, 357 (5th Cir. 2017).

This Court analyzes the constitutionality of a traffic stop using the two-step inquiry set forth in *Terry v. Ohio*, 392 U.S. 1 (1968).  *United States v. Andres*, 703 F.3d 828, 832 (5th Cir. 2013).  At the first step, the Court determines "whether the stop was justified at its inception." *Id.* "For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle."  *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005).  Reasonable suspicion must be "particularized," meaning "the police officer must be able to point to specific and articulable facts" justifying the stop.  *Alvarado-Zarza*, 782 F.3d at 249 (quoting *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *Terry*, 392 U.S. at 21).  Reasonable suspicion can rest upon a mistake of law or fact so long as the mistake is objectively reasonable.  *Alvarado-Zarza*, 782 F.3d at 249 (citing *Heien v. North Carolina*, 574 U.S. 54, 60–61 (2014); *Illinois v. Rodriguez*, 497 U.S. 177, 185 (1990)).  Assuming the stop was justified, we move to the second step, where we determine "whether the officer's subsequent actions were reasonably related in scope to the circumstances that justified the stop of the vehicle in the first place."  *United States v. Macias*, 658 F.3d 509, 517 (5th Cir. 2011).  "A traffic stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop,

unless further reasonable suspicion, supported by articulable facts, emerges." *United States v. Brigham*, 382 F.3d 500, 507 (5th Cir. 2004) (en banc).

Finch argues that he did not violate any traffic laws and therefore the stop was unlawful because there was no reasonable suspicion of criminal activity. Specifically, Finch contends that Officer Sanchez's own dash camera recording "clearly" depicts Finch signaling the first lane change. As to the second lane change, Finch argues the lanes were merging into each other due to construction in the area, and Texas law does not require signaling in such circumstances. The Government disagrees with Finch's assessment of the dash cam evidence as to the first lane change and argues that, even if the dash cam recording is unclear, other evidence supports the finding that Finch failed to activate his turn signal before changing lanes from the middle to the left lane. As to the lane change from the left to middle and right lanes, the Government challenges Finch's contention that he was not required to signal this change due to the merging lanes.

The undersigned agrees with the Government that the dash cam video of the first lane change is ambiguous as to whether Finch used his blinker. However, the undersigned need not decide whether Finch used his signal during the first lane change, as it is undisputed that he did not signal his lane change when he reached the construction area and moved from the left lane through the middle lane to the right lane. In Texas, "an operator" of a motor vehicle is required to use a signal "to turn, change lanes, or start from a parked position." Tex. Transp. Code § 545.104(a). The statute does not specifically address whether signaling is required when lanes merge and end due to temporary construction. Nor has this issue been addressed or settled in the case law.

Finch cites two opinions from the Texas Court of Criminal Appeals in support of his argument that signaling was not required in the circumstances at issue here.  In *Mahaffey I*, the Texas Court of Criminal Appeals held that a signal was not required where a driver followed highway traffic signs stating "Lane Ends—Merge Left" and merged due to traffic lanes narrowing from four to two lanes. *Mahaffey v. State*, 316 S.W.3d 633, 634–43 (Tex. Crim. App. 2010).   The Texas court reasoned that this scenario was not a "turn" under the Texas Transportation Code and the Texas Driver's Handbook does not indicate that a driver must signal when a lane merges into another lane—save for the situation when a driver enters a freeway.  *Id.* at 642–43.   In *Mahaffey II*, the Texas Court of Criminal Appeals again reached the same conclusion, holding that the driver was not required under Texas law to signal when the lane in which he was driving ended when the roadway merged.  *Mahaffey v. State*, 364 S.W.3d 908, 911–12 (Tex. Crim. App. 2012).  Finch argues that these precedents foreclose the Government's argument that Officer Sanchez's mistake of law—if any—was objectively reasonable.   The undersigned disagrees.

Importantly, *Mahaffey* did not address temporary road construction like that at issue here, but rather the permanent narrowing of traffic from four to two lanes as the roadway approached a bridge over a lake.  *Id.* at 909–10.  And in reaching its conclusion, the court emphasized in *Mahaffey II* that the officer conducting the traffic stop based on the failure to signal the merge testified that the defendant's vehicle "never crossed over any lane dividers or markers" and the trial court found that defendant had failed to use his turn signal "after the lane markings ended as the two lanes merged into one."  *Id.* at 910–11.  Thus, the Criminal Court of Appeals determined that there was not a lane change that could have required a signal, as the first lane no longer existed at the time the defendant began driving in the second lane.  *Id.* at 913.  The defendant in

*Mahaffey* only made one decision—to follow the course of the roadway he was traveling "all the while remaining in a single lane." *Id.* Accordingly, the "cessation of lane markings" and the defendant's timing of movement from one lane to another both were critical to the *Mahaffey* court's decision. *See id.* at 914.

In contrast here, the lanes across which Finch drove his vehicle were lanes that were obstructed by construction. Some of the lanes did end, practically speaking, due to signage and traffic cones, but there was no "cessation of lane markings" and the lanes did not end by design. Rather, Finch drove his vehicle across existing lane markings at a moment when all of the lanes remained demarcated. Thus, this case presents factual distinctions from *Mahaffey I* and *II*, which make any mistake of law on Officer Sanchez's part as to the need for signaling in this case objectively reasonable. If anything, the safety concerns prompting the signaling requirement for merging across lanes would be all the greater in this instance, where drivers would likely be familiar with the roadway and surprised by the temporary alteration of the flow of traffic across the lanes.

Officer Sanchez testified at the Court's hearing that he observed construction on the left side of the roadway while traveling with traffic several cars behind Finch's vehicle and that he did not believe the construction changed the requirement that Finch use his signal to change lanes. That comports with the undersigned's interpretation of the law and the distinction between this scenario and the circumstances in *Mahaffey*. But even if Officer Sanchez is mistaken as to the requirement of signaling a lane change in a construction zone due to merging lanes, this mistake is objectively reasonable. Thus, Officer Sanchez had reasonable suspicion to believe that a traffic violation had occurred (irrespective of the first lane change), and the traffic stop did not violate the Fourth Amendment.

In sum, the undersigned does not believe Officer Sanchez was mistaken in his understanding of Texas traffic laws.  But regardless, any mistake of law or fact by Officer Sanchez was objectively reasonable.  Accordingly, there is no basis to suppress the evidence observed in plain view upon executing the traffic stop, and the Court should deny the motion to suppress evidence on this basis.

**B.      Finch was not in custody for *Miranda* purposes during his initial brief exchange with Officer Sanchez, and his pre-*Miranda* statements should not be suppressed.**

Finch argues that his statements to law enforcement at the beginning of the traffic stop must be suppressed because Officer Sanchez subjected him to unwarned custodial interrogation. The Government contends that no custodial interrogation took place prior to the *Miranda* warnings, and suppression is therefore not required as to Finch's pre-*Miranda* statements.  The undersigned agrees with the Government.

Under the Fifth Amendment, if officers subject a suspect to custodial interrogation, the officers must inform the suspect of his or her rights under *Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  *Miranda* custody occurs when a suspect is "placed under formal arrest or when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Bengivenga*, 845 F.2d 593, 595 (5th Cir. 1988) (en banc).  "Interrogation" means either express questioning by officers or "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

The parties do not focus their briefing on whether Finch was interrogated during the brief exchange with Officer Sanchez prior to providing him with *Miranda* warnings, and the Court need not decide this issue, as the resolution of this part of Finch's motion turns on whether he

10

was in custody.  To determine if a suspect is in *Miranda* custody, courts must consider (1) the circumstances surrounding the interrogation and (2) under those circumstances, whether a reasonable person would have felt "he or she was not at liberty to terminate the interrogation and leave."  *Thompson v. Keohane*, 516 U.S. 99, 112 (1995).  "In other words, the court must consider whether 'a reasonable person in the suspect's position would have understood the situation to constitute *a restraint on freedom of movement of the degree which the law associates with formal arrest*.'"  *United States v. Coulter*, 41 F.4th 451, 458 (5th Cir. 2022) (quoting *Bengivenga*, 845 F.2d at 596) (emphasis in original).  Additionally, the Fifth Circuit requires courts also to "assess whether the environment surrounding the questioning implicated the concerns identified in *Miranda*."  *Id.* at 457.

The Fifth Circuit has repeatedly considered certain key details when analyzing whether an individual was or was not in custody for *Miranda* purposes.  *United States v. Wright*, 777 F.3d 769, 775 (5th Cir. 2015).  Those factors include: (1) the length of the questioning, (2) the location of the questioning, (3) the accusatory, or non-accusatory, nature of the questioning, (4) the amount of restraint on the individual's physical movement, and (5) statements made by officers regarding the individual's freedom to move or leave.  *Id.*  Whether a suspect is in Miranda custody is an "objective" question: "The subjective intent of neither the officer nor the defendant is relevant to the custody determination."  *United States v. Chavira*, 614 F.3d 127, 133 (5th Cir. 2010).

The first factor—the length of the pre-*Miranda* questioning—weighs in favor of finding Finch was not in custody at the beginning of the traffic stop.  Upon approaching Finch's vehicle, Officer Sanchez noticed the sheet covering persons in the back seat, shone his light into the vehicle and asked, "Why is he lying down like that?"  He then placed Finch in handcuffs and

11

repeated the question, "What are they doing back there?"  He then directed Finch "to be honest now" and again asked, "What are they doing back there?"  Officer Sanchez then asked a third question, "Where did you find them?"  And then, "Whose car is this?"  At this point, there was a break in the questioning until Officer Sanchez provided Finch with *Miranda* warnings.  The entire initial exchange was exceedingly brief—lasting no more than two minutes.  The Fifth Circuit has found that a detention of approximately an hour raises "considerable suspicion" regarding custody, *see United States v.* Harrell, 894 F.2d 120, 124 n.1 (5th Cir. 1990), but a 30-minute and 15-minute interview have been found to suggest a suspect was not in custody, *Coulter*, 41 F.4th at 459; *United States v. Ortiz*, 781 F.3d 221, 233 (5th Cir. 2015).  The very brief questioning here suggests Finch was not in custody during the pre-*Miranda* questioning.

As to the location of the questioning, the undersigned finds this factor weighs in favor of finding Finch was in custody.  Finch was interviewed in a public location on the side of a roadway.  "Interrogations in public settings are less police dominated than stationhouse interrogations; the public nature reduces the hazard that officers will resort to overbearing means to elicit incriminating responses and diminishes the individual's fear of abuse for failure to cooperate."  *Chavira*, 614 F.3d at 135 (citing *Bengivenga*, 845 F.2d at 598).  Thus, "[t]he fact that an interview takes place in a public location weighs against the conclusion that a suspect is in custody . . . ."  *Ortiz*, 781 F.3d at 231 (internal quotation and citation omitted).  However, the fact that the traffic stop occurred close to midnight in the dark of the night mitigates the reduction in the risk of coercion due to the public nature of the location.  Additionally, at least two other police officers were present during the interrogation and were assisting with securing and removing the eight persons found in Finch's vehicle.  Whereas a small number of officers present at the scene of interrogation (such as one or two officers) could reduce the suspect's

"sense of vulnerability," *Bengivenga*, 845 F.2d at 598, there was a larger police presence here, which created an environment in which police dominated the encounter.

As to the third factor, the undersigned finds this factor weighs against finding Finch was in custody.  Officer Sanchez—though asking potentially incriminating questions—did not word his questions in an aggressive or threatening manner.  Moreover, although Officer Sanchez at one point demanded Finch "be honest now" about what the individuals in the back of the vehicle were doing, the Fifth Circuit recently considered a police encounter involving similar statements by an officer for a suspect to "be honest" and "real upfront" and determined that, in light of the overall non-threatening tenor of the exchange, the nature of the questioning was non-accusatory and weighed against a finding of custody.  *Coulter*, 41 F.4th at 459–60.

As to the fourth and fifth factors, the amount of restraint on Finch's physical movement and statements made regarding Finch's ability to end the questioning, the undersigned finds these factors weigh at least somewhat in favor of a finding of custody.  The undersigned acknowledges that merely putting handcuffs on a suspect does not automatically transform an investigatory detention into an arrest.  *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993).  And the Fifth Circuit recently found that a suspect's handcuffing during a valid traffic stop does not necessarily constitute *Miranda* custody, because "objective concerns for officer safety necessitated the amount of restraint generated by the handcuffs."  *Coulter*, 41 F.4th at 460.  However, in *Coulter*, the handcuffing of the suspect was distinct in several respects from the restraint on Finch's movement here.

The suspect in *Coulter* was stopped for an expired registration and lack of insurance, and he voluntarily stepped out of the van when stopped by a patrolling officer.  *Id.* at 454.  The officer questioned the suspect as to whether he had any guns or anything illegal in the van before

placing the suspect in handcuffs. *Id.*  Once the officer smelled marijuana emitting from the van, he asked for a fourth time whether the suspect had a gun, and upon the suspect's admission of there being a firearm in the vehicle, the officer informed the suspect that he was handcuffing him "for officer safety" so that he could not "run up and grab the gun." *Id.*  Importantly, the officer repeatedly informed the suspect that he was just being "detained." *Id.* at 455.

In contrast here, when Officer Sanchez approached the vehicle for the traffic stop, he shone his flashlight on the persons hiding under the sheet and then directed Finch to exit the vehicle and immediately placed him in handcuffs.  Officer Sanchez never told Finch that he was only being temporarily detained or expressed anything to Finch that would have implied the restraint placed upon him was not akin to a formal arrest.  Nor was there any practical separation between the restraint on Finch's movement before and after his being given *Miranda* warnings. The questions posed to the suspect in *Coulter* explicitly focused on officer safety, and the officer expressly informed the suspect that the restraint on his movement was necessitated by safety concerns.  Here, the questioning focused on the car's passengers and Finch was not explicitly reassured that he was not under arrest at the outset of the police encounter.   On the other hand, Officer Sanchez would have reasons to ask about the persons in the back seat other than to obtain information about a potential human smuggling event—it not safe or legal to drive with multiple people lying in the backseat without seatbelts, and there was testimony that at first, the officer was not even sure about what situation he was encountering, including whether it was dead bodies or living people in the back seat.  Still, factors four and five cut somewhat more in favor of finding that Finch was in custody than not.

Based on a consideration of all five factors, the undersigned concludes that the circumstances surrounding Finch's pre-*Miranda* exchange with Officer Sanchez cut both in

14

favor of and against a finding of custody.  However, the extreme brevity of the exchange and the non-coercive nature of the questioning tips the scale in favor of a finding that Finch was not in custody.  Furthermore, even if the Court were to find that Finch would not have felt free to leave or to terminate the exchange based on an evaluation of the five factors applied in this Circuit, the second step of the custodial analysis required by the Fifth Circuit in *Coulter* would foreclose the relief Finch seeks here.

Again, the second step of the custody analysis requires this Court to determine whether the environment in which Finch was questioned presented the same "inherently coercive pressures as the type of station house questioning at issue in *Miranda*."  *Id.* at 462.  Due to the non-accusatory and exceedingly brief nature of the initial exchange with Officer Sanchez, the Court finds it did not.  *See id.* (finding 15-minute encounter outside of the suspect's parents' home fell short "of the sorts of police dominated and compelling atmospheres presented in the four cases under review in *Miranda v. Arizona*") (internal quotation and citation omitted).

In summary, the totality of the circumstances weigh in favor of finding that Finch was not in custody during the brief one to two-minute period of questioning prior to being read his *Miranda* warnings.  Accordingly, Finch was not subjected to unwarned custodial interrogation prior to receiving *Miranda* warnings, and the Court should deny his request to suppress all pre-warning statements.

**C.     Officer Sanchez provided Finch with sufficient *Miranda* warnings, and his post-*Miranda* statements should not be suppressed.**

Finch argues that, although Officer Sanchez provided him with some warnings during the interrogation, the warnings provided were sufficient under the Fifth Amendment because they were garbled and incomprehensible.  The undersigned disagrees and finds that Officer Sanchez

provided Finch with adequate warnings and Finch voluntarily waived his *Miranda* rights before

providing additional statements.

Miranda v. Arizona does not prescribe a specific manner, speed, or wording for a

suspect's legal warnings to be sufficient.  384 U.S. 436 (1966).  It simply requires that a person

"be warned that he has a right to remain silent, that any statement he does make may be used as

evidence against him, and that he has a right to the presence of an attorney, either retained or

appointed."  *Id.* at 444.  The Government must only show that the Defendant's waiver of his

*Miranda* rights was done "voluntarily, knowingly, and intelligently."  *Id.*

The body camera footage in evidence clearly depicts Officer Sanchez providing Finch

with *Miranda* warnings while Finch sat on the curb by the roadside.  Although Officer Sanchez

spoke quickly to Finch as he read him his rights, he covered the key requirements of *Miranda*—

informing Finch that he had the right to remain silent, that any statement could be used against

him, that he had the right to an attorney, and that if he could not afford an attorney, one could be

appointed.  He also told Finch he could stop answering questions at any point he wanted.

Importantly, Officer Sanchez asked Finch two times if he understood the rights and required an

affirmative statement demonstrating his understanding.  Finch responded audibly, "yes."

Officer Sanchez at times speaks at a fast pace and does not always articulate his words

clearly.  This was true during his testimony and the video also confirms this.  But the critical

aspects of the *Miranda* warnings were conveyed, and Finch confirmed he understood them.  The

Government has therefore carried its burden to demonstrate Finch's waiver of his right to remain

silent and to obtain an attorney was both knowing and voluntary.  That some individual words

are difficult to understand on the video does not invalidate the warnings or Finch's waiver.

There is therefore no basis for the suppression of incriminating statements made by Finch after his voluntary waiver of rights.

### III.  Conclusion and Recommendation

Accordingly, having considered Defendant's motion, the response and reply thereto, the arguments of counsel at the hearing, the supplemental briefing, and the governing law, it is recommended that Defendant's Motion to Suppress Fruits of Illegal Traffic Stop [#35] be **DENIED**.

### IV.  Instructions for Service and Notice of Right to Object/Appeal

The United States District Clerk shall serve a copy of this report and recommendation on all parties by either (1) electronic transmittal to all parties represented by attorneys registered as a "filing user" with the clerk of court, or (2) by mailing a copy to those not registered by certified mail, return receipt requested.  Written objections to this report and recommendation must be filed **within fourteen (14) days** after being served with a copy of same, unless this time period is modified by the district court.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  Objections are limited to no more than 20 pages unless leave of court is granted.  The party shall file the objections with the Clerk of Court and serve the objections on all other parties.  A party filing objections must specifically identify those findings, conclusions or recommendations to which objections are being made and the basis for such objections; the district court need not consider frivolous, conclusive or general objections.  A party's failure to file written objections to the proposed findings, conclusions and recommendations contained in this report shall bar the party from a *de novo* determination by the district court.  *Thomas v. Arn*, 474 U.S. 140, 149–52 (1985); *Acuña v. Brown & Root*, *Inc.,* 200 F.3d 335, 340 (5th Cir. 2000).  Additionally, failure to file timely written objections to the proposed findings, conclusions and recommendations contained

in this report and recommendation shall bar the aggrieved party, except upon grounds of plain error, from attacking on appeal the un-objected-to proposed factual findings and legal conclusions accepted by the district court. *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc), *superseded by statute on other grounds*, 28 U.S.C. § 636(b)(1).

SIGNED this 2nd day of February, 2024.

_____
ELIZABETH S. ("BETSY") CHESTNEY
UNITED STATES MAGISTRATE JUDGE